IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

CHARLESTON DIVISION

LEZLEY ANN JEFFREY,

        Plaintiff,

v.                                   Case No.: 2:15-cv-11207

CAROLYN W. COLVIN,
Acting Commissioner of the
Social Security Administration,

        Defendant.

**PROPOSED FINDINGS AND RECOMMENDATIONS**

This action seeks a review of the decision of the Commissioner of the Social Security Administration (hereinafter "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-433, 1381-1383f. The matter is assigned to the Honorable John T. Copenhaver, Jr., United States District Judge, and was referred to the undersigned United States Magistrate Judge by standing order for submission of proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). Presently pending before the Court are Plaintiff's Brief in Support of Judgment on the Pleadings and the Commissioner's Brief in Support of Defendant's Decision, requesting judgment in her favor. (ECF Nos. 10, 11).

The undersigned has fully considered the evidence and the arguments of counsel. For the following reasons, the undersigned **RECOMMENDS** that Plaintiff's request for

judgment on the pleadings be **DENIED**, the Commissioner's request for judgment on the pleadings be **GRANTED**, the Commissioner's decision be **AFFIRMED,** and that this case be **DISMISSED** and removed from the docket of the Court.

## I.    Procedural History

On May 2, 2012, Plaintiff Lezley Ann Jeffrey ("Claimant"), completed applications for DIB and SSI, alleging a disability onset date of April 2, 2007, (Tr. at 206-18), due to "Manic Depression, Bipolar, Post Traumatic Stress Disorder, Anxiety, and Insomnia." (Tr. at 235). On December 21, 2013, Claimant filed a motion to amend the alleged onset date from April 2, 2007 to January 1, 2012. (Tr. at 228). The Social Security Administration ("SSA") denied Claimant's applications initially and upon reconsideration. (Tr. at 12). Claimant filed a request for an administrative hearing, which was held on January 6, 2014 before the Honorable Jack Penca, Administrative Law Judge ("ALJ"). (Tr. at 31-70). By written decision dated January 23, 2014, the ALJ found that Claimant was not disabled as defined in the Social Security Act. (Tr. at 12-25). The ALJ's decision became the final decision of the Commissioner on May 22, 2015, when the Appeals Council denied Claimant's request for review. (Tr. at 1-6).

Claimant timely filed the present civil action seeking judicial review pursuant to 42 U.S.C. § 405(g). (ECF No. 2). The Commissioner subsequently filed an Answer opposing Claimant's complaint and a Transcript of Proceedings. (ECF Nos. 8, 9). Claimant then filed a Brief in Support of Judgment on the Pleadings. (ECF No. 10). In response, the Commissioner filed a Brief in Support of Defendant's Decision, (ECF No. 11), to which Claimant filed a Reply. (ECF No. 12). Consequently, the matter is fully briefed and ready for resolution.

II.    **Claimant's Background**

Claimant was 42 years old at the time of the alleged onset of disability, and 44 years old at the time of the ALJ's decision. (Tr. at 12, 36). She has at least a high school education and communicates in English. (Tr. at 47, 234, 243). She previously worked as a retail cashier and stocker, although her prior employment did not constitute past relevant work for purposes of the disability determination. (Tr. at 23, 236).

III.    **Summary of ALJ's Decision**

Under 42 U.S.C. § 423(d)(5), a claimant seeking disability benefits has the burden of proving a disability. *See Blalock v. Richardson,* 483 F.2d 773, 775 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations establish a five-step sequential evaluation process for the adjudication of disability claims. If an individual is found "not disabled" at any step of the process, further inquiry is unnecessary and benefits are denied. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The first step in the sequence is determining whether a claimant is currently engaged in substantial gainful employment. *Id.* §§ 404.1520(b), 416.920(b). If the claimant is not, then the second step requires a determination of whether the claimant suffers from a severe impairment. *Id.* §§ 404.1520(c), 416.920(c). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." *Id.* If severe impairment is present, the third inquiry is whether this impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4 (the "Listing"). *Id.* §§ 404.1520(d), 416.920(d). If so, then the claimant is found disabled and awarded benefits.

3

However, if the impairment does not meet or equal a listed impairment, the adjudicator must assess the claimant's residual functional capacity ("RFC"), which is the measure of the claimant's ability to engage in substantial gainful activity despite the limitations of his or her impairments. *Id.* §§ 404.1520(e), 416.920(e). After making this determination, the fourth step is to ascertain whether the claimant's impairments prevent the performance of past relevant work. *Id.* §§ 404.1520(f), 416.920(f). If the impairments do prevent the performance of past relevant work, then the claimant has established a *prima facie* case of disability, and the burden shifts to the Commissioner to demonstrate, in the fifth and final step of the process, that the claimant is able to perform other forms of substantial gainful activity, given the claimant's remaining physical and mental capacities, age, education, and prior work experiences. 20 C.F.R. §§ 404.1520(g), 416.920(g); *see also McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983). The Commissioner must establish two things: (1) that the claimant, considering his or her age, education, skills, work experience, and physical shortcomings has the capacity to perform an alternative job, and (2) that this specific job exists in significant numbers in the national economy. *McLamore v. Weinberger*, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the SSA "must follow a special technique at each level in the administrative review process," including the review performed by the ALJ. 20 C.F.R. §§ 404.1520a(a), 416.920a(a). Under this technique, the ALJ first evaluates the claimant's pertinent signs, symptoms, and laboratory results to determine whether the claimant has a medically determinable mental impairment. *Id.* §§ 404.1520a(b), 416.920a(b). If an impairment exists, the ALJ documents her findings. Second, the ALJ rates and documents the degree of functional limitation resulting from the impairment according to criteria specified in *Id.* §§ 404.1520a(c), 416.920a(c). Third,

after rating the degree of functional limitation from the claimant's impairment(s), the ALJ determines the severity of the limitation. *Id.* §§ 404.1520a(d), 416.920a(d). A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning, and concentration, persistence or pace) and "none" in the fourth (episodes of decompensation of extended duration) will result in a finding that the impairment is not severe unless the evidence indicates that there is more than minimal limitation in the claimant's ability to do basic work activities. *Id.* §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, if the claimant's impairment is deemed severe, the ALJ compares the medical findings about the severe impairment and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment meets or is equal to a listed mental disorder. *Id.* §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if the ALJ finds that the claimant has a severe mental impairment, which neither meets nor equals a listed mental disorder, the ALJ assesses the claimant's residual mental functional capacity. *Id.* §§ 404.1520a(d)(3), 416.920a(d)(3). The regulations further specify how the findings and conclusion reached in applying the technique must be documented by the ALJ, stating:

> The decision must show the significant history, including examination and laboratory findings, the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(4), 416.920a(e)(4).

Here, the ALJ determined as a preliminary matter that Claimant met the insured status for disability insurance benefits through December 31, 2012. (Tr. at 14, Finding No. 1). At the first step of the sequential evaluation, the ALJ confirmed that Claimant had not engaged in substantial gainful activity since January 1, 2012, the amended alleged

disability onset date. (*Id.* at No. 2). At the second step of the evaluation, the ALJ found that Claimant had the following severe impairments: "chronic obstructive pulmonary disease (COPD) and hepatitis." (Tr. at 14-20, Finding No. 3). The ALJ also considered various physical ailments reflected in Claimant's medical records, but determined that they were non-severe, because they either did not persist for twelve consecutive months, or they did not cause a significant limitation in the Claimant's ability to perform basic work activities. (Tr. at 15-20). In addition, the ALJ assessed Claimant's psychological complaints, noting that Claimant had received mental health and substance abuse treatment. The ALJ reviewed findings from Claimant's medical providers, as well as functional evaluations, and concluded that Claimant had the medically determinable mental impairments of bipolar disorder and substance abuse and dependence. (*Id.*). Therefore, the ALJ examined Claimant's limitations in the four broad functional categories and found that Claimant was mildly limited in activities of daily living, social functioning, concentration, persistence, and pace, and had no episodes of decompensation of extended duration. (Tr. at 18-20). Consequently, Claimant's medically determinable mental impairments caused no more than mild limitations and were assessed as non-severe.

Under the third inquiry, the ALJ found that Claimant did not have an impairment or combination of impairments that met or medically equaled any of the impairments contained in the Listing. (Tr. at 20-21, Finding No. 4). Accordingly, the ALJ determined that Claimant possessed:

> [T]he residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that she can occasionally crawl and climb ladders, ropes, and scaffolds; she can frequently balance, stoop, kneel, crouch, and climb ramps and stairs. She must avoid concentrated exposure

to cold, heat, humidity, fumes, odors, dust, gases, poor ventilation, and
hazards.

(Tr. at 21-23, Finding No. 5). At the fourth step, the ALJ determined that Claimant had
no past relevant work. (Tr. at 23, Finding No. 6). Under the fifth and final inquiry, the
ALJ reviewed Claimant's past work experience, age, and education in combination with
her RFC to determine her ability to engage in substantial gainful activity. (Tr. at 23-24,
Finding Nos. 7-10). The ALJ considered that (1) Claimant was born in 1969, and was
defined as a younger individual age 18-49 on the alleged disability onset date; (2) she had
at least a high school education and could communicate in English; and (3) transferability
of job skills was not material to the disability determination because Claimant had no past
relevant work. (Tr. at 23, Finding Nos. 7-9). Given these factors, Claimant's RFC, and the
testimony of a vocational expert, the ALJ determined that Claimant could perform jobs
that existed in significant numbers in the national economy, including work as a motel
housekeeper, laundry folder, or marker at the unskilled, light level. (Tr. at 24-25, Finding
No. 10). Therefore, the ALJ found that Claimant was not disabled as defined in the Social
Security Act, and was not entitled to benefits. (Tr. at 25, Finding No. 11).

## IV.   Claimant's Challenge to the Commissioner's Decision

Claimant raises one challenge to the Commissioner's decision. (ECF No. 10 at 11-
15). She asserts that the ALJ failed to perform a proper credibility analysis, which resulted
in the ALJ erroneously discounting the effects of Claimant's physical and mental
limitations on her ability to perform daily activities. According to Claimant, the ALJ
cherry-picked the evidence, emphasizing portions of Claimant's testimony in which she
described her "good days" and omitting testimony detailing Claimant's "bad days." The
ALJ created a picture of Claimant's activities that was markedly skewed, failing to

7

accurately represent her level of function *on a daily basis*. Claimant argues that when the evidence is viewed as a whole, it fully supports her contention that her impairments preclude her from performing routine work activities on a sustained basis eight hours a day, five days a week.

In response, the Commissioner asserts that the ALJ complied with all applicable rules and regulations in conducting the credibility analysis, and the evidence supports his conclusion. (ECF No. 11 at 8-11). The Commissioner notes that the ALJ considered the medical evidence, Claimant's testimony, and other statements in evidence, correctly highlighting inconsistencies between Claimant's allegations and other persuasive pieces of evidence. Although the ALJ did not explicitly discuss every factor that was considered in evaluating Claimant's credibility, the Commissioner asserts that the ALJ was not required to do so. The ALJ's credibility discussion conveyed the primary reasons that he discounted the reliability of Claimant's statements regarding the severity and persistence of her symptoms; accordingly, the ALJ fulfilled his duty to assess Claimant's credibility and explain his determination.

## V.   **Relevant Medical Evidence**

The undersigned has reviewed all of the evidence before the Court, including the records of Claimant's health care examinations, evaluations, and treatment. The relevant medical information is summarized as follows.

### A. Treatment Records

Claimant had a longstanding history of mental health treatment, which included multiple hospitalizations for psychiatric care prior to the alleged onset of disability, (Tr. at 376-82, 552-57, 558-63, 685-92), with the last hospitalization occurring in August 2010. (Tr. at 685-92). At that time, Claimant voluntarily presented to Lewis-Gale Center

for Behavioral Health in Salem, Virginia with complaints of depression and alcohol dependence. (Tr. At 688). She was working at the time as a housekeeper and front desk clerk at a local motel and was living alone. (Tr. at 689). She was diagnosed with Bipolar Disorder, Anxiety Disorder, and alcohol dependence and was admitted for the administration of medications and treatment. (Tr. at 692). Claimant was discharged five days later in stable condition.

Shortly after her discharge from Lewis-Gale, Claimant left Virginia and returned to her home state of West Virginia. She resumed treatment at a local mental health care provider, Prestera Centers for Mental Health ("Prestera"). (Tr. at 715-18, 727-39, 757-61, 789-93). On September 29, 2010, during a session at Prestera, Claimant reported to Lee Wilson, B.A., that she had been residing in Roanoke, Virginia, but had now relocated to West Virginia and was out of her psychotropic medications. Claimant reported depression, as well as feeling manic, "hyper," anxious and easily agitated. She stated that she could not keep employment as she was even having trouble making herself do activities at her house. Claimant requested refills of the medications she had been taking in Virginia, indicating that her recent medications worked better than any medications she had ever received for her symptoms. Claimant was diagnosed with Bipolar Disorder and given a current GAF score of 65[1]. (Tr. at 718).

---

[1] The Global Assessment of Functioning ("GAF") Scale is a 100-point scale that rates "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness," but "do[es] not include impairment in functioning due to physical (or environmental) limitations." *Diagnostic Statistical Manual of Mental Disorders*, Am. Psych. Assoc., 34 (4th ed. text rev. 2000) ("DSM–IV*"). On the GAF scale, a higher score correlates with a less severe impairment. The GAF scale was abandoned as a measurement tool in the latest edition of the *Diagnostic and Statistical Manual of Mental Disorders* (5th ed. 2013) ("DSM–5"), in part due to its "conceptual lack of clarity" and its "questionable psychometrics in routine practice." DSM–5 at 16. A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships." DSM–IV at 34.

Ms. Wilson also completed an intake database form pertaining to Claimant, which covered basic information such as demographics, living situation, educational and legal background, symptom history and acuity, treatment history, level of functioning, medications, and mental status examination. (Tr. At 732-39). Ms. Wilson noted that Claimant had a stable living situation and family support; she was not currently abusing substances; and she was not currently taking any psychotropic medications. (*Id.*). Claimant also confirmed that when she was on medications, she was stable and generally able to work and function well. (Tr. at 789). Ms. Wilson documented Claimant's level of functioning as "no impairment" in the categories of accessing others, activities of daily living, personal safety, and school/work. Claimant was assessed as having "limited impairment" in the categories of maintaining relationships and social situations. (Tr. at 734). On mental status examination, Claimant's appearance, sociability, speech and thought content, orientation, recall memory, coping ability, and affect were all within normal limits. (Tr. at 737). Claimant reported her leisure activities to include taking her children and grandchildren on vacation, cooking, crocheting, and doing volunteer work. (Tr. at 791). Claimant told Ms. Wilson she was considering going to college to become a registered nurse. Claimant's prognosis with treatment was deemed to be excellent. (Tr. at 792).

On October 8, 2010, Claimant returned to Prestera for a comprehensive diagnostic psychiatric evaluation, which was performed by Louann Munday, Advanced Practice Nurse. (Tr. at 727-31). Claimant described her chief complaints as needing psychiatric help, counseling, and medications. (Tr. at 728). Claimant reported insomnia; decreased appetite, energy, and concentration; and occasional feelings of worthlessness, hopelessness, and anxiety. (Tr. at 728). However, she again confirmed that she was much

improved when taking her medication. Claimant stated her mood on that day was "happy." (*Id.*). On examination, Claimant was cooperative with normal speech. She had no motor abnormalities. (Tr. at 730). Her mood was happy and her affect was broad. Claimant's thought process and content were logical and goal oriented. She was alert and oriented with intact remote and immediate memory. Her insight and judgment were fair to poor. Claimant was diagnosed with Bipolar-Depressed; history of Antiluetic Abuse in remission; Alcohol Dependence in partial remission; and Post-traumatic Stress Disorder ("PTSD"). (Tr. at 730). Claimant received a GAF score of 55.[2] Claimant was referred for counseling and provided with prescriptions for Abilify, Seroquel, Effexor and Trazodone. She was advised to begin counseling. (Tr. at 731).

Claimant returned to Prestera one more time in 2010, and then came five times in 2011. On January 27, 2011, Claimant reported that she was eating and sleeping well, and although she continued to drink alcohol, she was not doing so as often. (Tr. at 761). Claimant complained of continued problems with hepatitis C. Accordingly, Nurse Munday advised Claimant to go to West Virginia Health Right[3] for medical care. Nurse Munday also stressed that Claimant would have to quit drinking in order for her hepatitis to improve. (Tr. at 763). Claimant's mental status examination was within normal limits. She was noted to be stable with medication and was again referred for counseling. Claimant's GAF score was 65. (Tr. at 762-63).

On May 19, 2011, Claimant reported having run out of Seroquel and being nervous.

---

[2] GAF scores between 51 and 60 indicate "Moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV at 32.

[3] West Virginia Health Right is a charitable clinic that provides free health care and dental services to thousands of uninsured and underinsured West Virginians. *See* www.wvhealthright.org.

She stated that she wanted disability, and she wanted something for her nerves. (Tr. at 765). Claimant's mental status examination was mostly within normal limits, except her motor activity was described as agitated, her sleep was inadequate, and her appetite was fair. (Tr. at 765-66). Claimant's diagnoses remained largely unchanged, although PTSD was not included as a diagnosis. She was given a GAF score of 60. Claimant asked for a prescription of Vistaril, which was given to her, and Claimant was instructed to return in four weeks. (Tr. at 767).

When Claimant returned a month later, on June 27, she reported being very happy and doing well on Vistaril. (Tr. at 769). Ms. Munday noted that Claimant appeared quite stable on her medications. Nevertheless, Claimant continued to drink five to six beers per week and had not gotten any treatment for her hepatitis C. She also continued to smoke one half pack of cigarettes per day. Claimant indicated that she was signing up for disability and also planned to marry her boyfriend. When discussing her alcohol intake, Claimant admitted that she had a serious alcohol dependence problem, but reported that she had cut back on her drinking, having previously gone through a 12-pack of beer each day. Claimant was willing to try a prescription of Campral in an effort to break her alcohol addiction. Her mental status examination was within normal limits. (Tr. at 769-70). Claimant was diagnosed with Bipolar I Disorder, most recent episode depressed, moderate; Alcohol Dependence; and Sedative, Hypnotic or Anxiolytic intoxication. Claimant received a GAF score of 69. (Tr. at 769-71). Claimant was instructed to continue with her medications and return in twelve weeks. She was also given Campral and told not to drink alcohol. Claimant reported receiving recent notification from the Health Department that she was positive for hepatitis C. Accordingly, Nurse Munday once again urged Claimant to seek treatment from West Virginia Health Right. (Tr. at 772).

On September 19, 2011, Claimant reported to Ms. Munday that she was very happy, felt her life was doing better, and she was working full time making pizza. (Tr. at 774). Claimant had stopped taking Trazodone and Seroquel and was not having any sleep or eating issues. She was planning to marry her boyfriend on New Year's Eve 2012. Claimant continued to smoke one half pack of cigarettes per day and drink four cans of beer once a week. Her mental status examination was recorded to be within normal limits. (Tr. at 774-75). Claimant's diagnosis remained unchanged. She received a GAF score of 72.[4] (Tr. at 774-76). Claimant was taken off Trazodone, Seroquel, Campral, and Vistaril. She was to continue to take Abilify and Effexor. (Tr. at 776).

Claimant returned on December 12, 2011. (Tr. at 779). Claimant was tearful, stating that she had lost her job and been off her medications for a week. Nurse Munday reiterated in her documentation that Claimant was stable when she was on her medications. Claimant was upset that she would not have money for Christmas. She had started to care for her grandson, who was disabled and required 24-hour care. Claimant stated that she had started drinking three to four beers three times per week, and she felt she could no longer hold down a job. She wanted to "work on getting disability." (*Id.*). A mental status examination was normal, except for inadequate sleep. (Tr. at 779-80). Claimant's diagnosis remained unchanged, but her GAF score at this visit was 63. (Tr. at 781-82). Claimant was advised to continue her medication regimen and received a requested prescription for Campral. Ms. Munday added Remeron to her medications. Claimant was advised to stop smoking and drinking alcohol. (Tr. at 782).

---

[4] A GAF score of 71-80 indicates that if symptoms are present, they are transient and expectable reactions to psychosocial stressors (e.g. difficulty concentrating after family argument); no more than slight impairment in social, occupational, or school functioning (e.g. temporarily falling behind in schoolwork). DSM-IV at 32.

Claimant returned to Ms. Munday on April 2, 2012 reporting she was very happy and doing well. (Tr. at 784). The only medications Claimant was taking were Abilify and Effexor. Claimant reported she had no sleep issues and did not need medication to help her sleep. Claimant also reported she was on good terms in her personal relationships and had returned to church. Claimant presented with an appropriate affect and normal mental status examination. (Tr. at 784-86). Her diagnosis remained unchanged. Claimant received a GAF score of 65. (Tr. at 786-87).

On July 23, 2012, Claimant presented to Boone Memorial Hospital's Emergency Department with complaints of shortness of breath and wheezing, which had been ongoing for the past week. (Tr. at 840). Claimant reported she had COPD and anxiety and she had occasional dry heaving and chest pain with productive cough. Claimant was oriented but not very pleasant. No shortness of breath was noted. Upon examination, Claimant had very mild abdominal tenderness and wheezing in both lungs. A chest x-ray revealed granulomatous disease that was healed with no significant interval change and no acute cardiopulmonary pathology or significant change when compared to x-ray of October 2010. (Tr. at 847). Claimant was diagnosed with exacerbation of COPD due to bronchitis, and chronic anxiety. She reported much improvement after taking medication and was released. (Tr. at 841).

On July 26, 2012, Claimant presented to Tri State Occupational for a ventilator function test. (Tr. at 804-07). Claimant showed no evidence of bronchospasm or acute respiratory illness. The test results concluded moderate COPD.

Claimant presented to Thomas Memorial Hospital on November 23, 2012 with complaints of intermittent chest pain for the past month. (Tr. at 953-59). Claimant also reported chronic abdominal pain located in the upper abdomen, nausea, vomiting, and

difficulty breathing. Her medical history included anemia, hepatitis, COPD, hypertension, alcoholism, peptic ulcer disease, nephrolithiasis, anxiety reaction, bipolar disorder, depression and mental illness. Claimant stated that she smoked cigarettes daily and drank alcohol occasionally. (Tr. at 953). On examination, Claimant was described as alert, oriented and in no acute distress. (Tr. at 954). She was not in respiratory distress. Her heart rate and rhythm were normal, as were her pulses and breath sounds. A chest x-ray revealed calcified granulomas in the right lung; however, there was no pneumothorax, pleural right effusion, or focal infiltrate seen. Claimant's heart size and pulmonary vascularity was within normal limits, and her cardiopulmonary examination was within normal limits except for than right lung wheezing. Claimant's mood and affect were normal; her speech was normal and non-pressured. (Tr. at 962). An EKG showed sinus tachycardia at a rate of 118 beats per minute, relatively slow R-wave progression but was otherwise with no acute changes. Cardiac enzymes were negative. (Tr. at 962). Claimant was admitted to the hospital for further testing. The following day, she underwent a dual isotope stress test, which had results within normal limits, demonstrating normal left ventricular systolic function and normal wall motion. (Tr. at 970-71). She was discharged.

Claimant presented to Boone Memorial Hospital on January 22, 2013 for a chest x-ray. (Tr. at 838). The x-ray revealed a well inflated clear lung field with no pleural effusion. The cardiovascular structure and visualized bony elements were unremarkable. No acute cardiopulmonary pathology was seen.

On May 30, 2013, Claimant returned to Boone Memorial Hospital with complaints of a rash on her face, elevated blood pressure, being out of her medications, having no primary care physician or insurance, and vomiting daily. (Tr. at 815). She requested a gastroenterologist referral due to prior gastric bypass surgery. The record indicates that

Claimant left prior to receiving treatment. (Tr. at 817-18). Claimant returned to Boone Memorial Hospital a few days later on June 7 with complaints of congestion and cough, requesting medication and breathing treatments. (Tr. at 809-11). Claimant was diagnosed with COPD.

On October 7, 2013, Claimant returned to Boone Memorial Hospital with complaints of intermittent productive cough, abdominal pain, and alternating chills and feeling hot. (Tr. at 938-44). Claimant appeared oriented, calm, and pleasant with normal memory and a steady gait, but had moderate diffuse wheezing. (Tr. at 938). An abdominal and chest x-ray revealed a right basilar nodule, likely benign; however, there was no evidence of pneumonia. (Tr. at 945). A CT scan of the abdomen revealed a 4 cm left ovarian cyst with no acute inflammatory change or free fluid. (Tr. at 946). Claimant was diagnosed with urinary tract infection and acute bronchitis. She was provided prescriptions of Phenergan, Albuterol, and Cipro. Claimant was given a work release form and advised to return as needed. (Tr. at 940).

On October 21, 2013, Claimant presented to Charleston Area Medical Center for a CT scan of the chest for the purpose of evaluating a pulmonary nodule in her right lung. (Tr. at 992). Additional health history included shortness of breath, cough, COPD, smoker of twenty years, childhood asthma, hepatitis B [sic], and daily nebulizer. Dr. Frank Muto interpreted the CT scan as showing no evidence of significant pulmonary nodule or mass. Patchy pulmonary opacities were seen, along with bronchial wall thickening that was suspicious for infectious or inflammatory changes and evidence of prior granulomatous exposure.

### B. Evaluations and Opinions

On July 24, 2012, Rosemary L. Smith, Psy.D., performed a Psychiatric Review

16

Technique. (Tr. at 77-79). Claimant was found to have an affective disorder in the form of bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes currently characterized by either or both syndromes. She was also found to have substance addiction disorders. As to functional limitations, Claimant was mildly limited in her activities of daily living, maintaining social functioning, concentration, persistence and pace. (Tr. at 78). Claimant had no episodes of decompensation and there was no evidence of paragraph "C" criteria. Dr. Smith remarked that Claimant had a significant history of alcohol abuse and dependence for which she had been hospitalized in the past. Although the medical records indicated a recent decrease in Claimant's alcohol consumption, Claimant continued to drink alcohol on a regular basis. Dr. Smith noted that Claimant received mental health treatment every three months with medical records documenting that Claimant functioned well when taking her prescribed medications. Dr. Smith opined there was no evidence of significant functional limitations due to a mental impairment. (*Id.*).

On July 26, 2012, Stephen Nutter, M.D., completed an internal medicine examination for the West Virginia Disability Determination Service. (Tr. at 798-802). Claimant complained of breathing problems that began in childhood. She stated that she had asthma all her life and was eventually diagnosed with COPD. (Tr. at 798). Claimant also complained of chronic cough and wheezing that required daily usage of an inhaler. Claimant reported being able to walk one-half mile on flat ground before shortness of breath set in, causing her to stop and rest. Claimant's current medications included Lisinopril, venlafaxine, metoprolol, Abilify and Ventolin. Claimant admitted to smoking one pack of cigarettes per day for the past twenty years and drinking alcohol occasionally. (Tr. at 798-99). She complained of having abdominal pain in the mid epigastric region

accompanied by nausea and fatigue. Claimant told Dr. Nutter about her hepatitis C notification from the Health Department; however, she still had not pursued treatment for that condition. Claimant also reported chest pain that started when she was in her teens, which radiated to her neck and back. The pain was triggered by coughing, stress, exertion, walking up and down stairs, and reading, and was associated with shortness of breath and diaphoresis.

On examination, Claimant walked with a steady gait and did not require assistive devices. She was stable at station, and comfortable in both supine and sitting positions. Her recent and remote memory were good. (Tr. at 799). Claimant's lung fields were clear to auscultation and percussion without wheezes, rales, or rhonchi. Her breath sounds were symmetrical bilaterally, and she had no chest tenderness to palpation. Claimant was not observed to be short of breath, either with exertion or when lying flat. Dr. Nutter saw no clubbing or cyanosis, and his cardiovascular examination of Claimant was normal. Claimant's abdomen was described as mildly obese with tenderness in the mid epigastrium and right upper quadrant, but her liver was not tender, and there was no evidence of organomegaly or masses. Examination of Claimant's upper and lower extremities, hands, cervical and dorsolumbar spine yielded unremarkable findings. Straight-leg raise was normal in both seated and supine positions. Claimant could stand without difficulty on her left leg, but had some trouble balancing when standing on her right leg. Claimant could bend forward at the waist to ninety degrees; lateral bending of the spine was to twenty degrees bilaterally; lateral bending of the lumbar spine caused some complaints of low back pain; however, there was no hip joint tenderness, redness, warmth, swelling or crepitus. Range of flexion of Claimant's hips with the knees flexed was to one hundred degrees bilaterally. (Tr. at 800-801). Claimant's muscle strength was

normal at 5/5 bilaterally in upper and lower extremities. She showed no evidence of atrophy and her sensory modalities were well preserved. Hoffman and Babinski signs were negative. There was no clonus. Claimant could perform tandem gait without issue, but was unable to squat or do three quarters of a squat due to pain in her thighs. (Tr. at 801).

Dr. Nutter's diagnostic impression was COPD, asthma, abdominal and chest pain. He noted that Claimant complained of asthma and COPD; however, her pulmonary examination was normal. She was not short of breath with mild exertion or in the supine position, and had no clubbing or cyanosis. Claimant reported abdominal pain and a diagnosis of hepatitis C, with pain and tenderness in the right upper quadrant and mid epigastrium on examination; however, she had no evidence of hepatomegaly, jaundice, ascites, spider angiomas, palmar erythema, asterixis or encephalopathy. (*Id.*). With respect to Claimant's complaints of chest pain, Dr. Nutter felt her medical history was atypical for angina, and there was no evidence of congestive heart failure. He found no S3 gallop, rales, or jugulovenous distention. (Tr. at 802).

Robert Mogul, M.D., completed a Physical Residual Functional Assessment on August 8, 2012. (Tr. at 79-81). Dr. Mogul found Claimant could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand, walk or sit about six hours in an eight-hour workday, with unlimited ability to push and/or pull. (Tr. at 79-80). In reaching his conclusions, Dr. Mogul relied on Dr. Nutter's consultative examination findings; specifically, that Claimant had a normal gait, normal walking maneuvers, clear lungs, non-tender liver, tender mid-epigastric right upper quadrant, some pain with lateral bending of the spine, but was neurologically intact. Dr. Mogul found Claimant could frequently climb ramps, stairs, stoop, kneel, and crouch. She could

19

occasionally climb ladders, ropes, scaffolds, and crawl. Claimant had no manipulative, communicative, or visual limitations. As to environmental limitations, Dr. Mogul felt Claimant could have unlimited exposure to wetness, noise, and vibration; however, she should avoid concentrated exposure to extreme cold, heat, humidity, fumes, odors, dusts, gases, poor ventilation, and hazards. (Tr. at 80-81). Dr. Mogul opined that Claimant's allegations were only partially credible. He noted that Claimant could walk one mile before having to rest; she could go out alone, drive; and she was able to handle her personal care. He stated that the medical findings were inconsistent with the severity of symptoms alleged by Claimant. (Tr. at 81).

G. David Allen, Ph.D., completed a case analysis on September 4, 2012. (Tr. at 102-103). After reviewing the pertinent evidence in the file, Dr. Allen affirmed the Psychiatric Review Technique of Dr. Smith. (Tr. at 102-03).

A. Rafael Gomez, M.D. completed a case analysis on September 6, 2012. (Tr. at 105-106). He also reviewed the evidence in the record, and agreed with the Physical Residual Functional Capacity Assessment prepared by Dr. Mogul, as written.

## VI.   <u>Scope of Review</u>

The issue before the Court is whether the final decision of the Commissioner is based upon an appropriate application of the law and is supported by substantial evidence. *See Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). In *Blalock v. Richardson,* the Fourth Circuit Court of Appeals defined "substantial evidence" to be:

> [E]vidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

483 F.2d 773, 776 (4th Cir. 1973) (quoting *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th

Cir. 1966)). When examining the Commissioner's decision, the Court does not conduct a *de novo* review of the evidence to ascertain whether the claimant is disabled. *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (citing *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Instead, the Court's role is limited to insuring that the ALJ followed applicable regulations and rulings in reaching his decision, and that the decision is supported by substantial evidence. *Hays*, 907 F.2d at 1456. If substantial evidence exists, the Court must affirm the Commissioner's decision "even should the court disagree with such decision." *Blalock*, 483 F.2d at 775.

## VII.  **Discussion**

Pursuant to 20 C.F.R. §§ 404.1529, 416.929, the ALJ evaluates a claimant's report of symptoms using a two-step method. First, the ALJ must assess whether the claimant's medically determinable medical and psychological conditions could reasonably be expected to produce the claimant's symptoms, including pain. 20 C.F.R. §§ 404.1529(a), 416.929(a). In other words, "an individual's statements of symptoms alone are not enough to establish the existence of a physical or mental impairment or disability." Social Security Ruling ("SSR") 16-3p, 2016 WL 1119029, at *2 (effective March 16, 2016).[5] Instead, there must exist some objective "[m]edical signs and laboratory findings, established by medically acceptable clinical or laboratory diagnostic techniques" which demonstrate "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the

---

[5] The SSA recently provided guidance for evaluating a claimant's report of symptoms in the form of SSR 16-3p. In doing so, the SSA rescinded SSR 96-7p, 1996 WL 374186, which the parties relied on in their memoranda. The undersigned finds it appropriate to consider Claimant's second challenge under the more recent Ruling as it "is a clarification of, rather than a change to, existing law." *Matula v. Colvin*, No. 14 C 7679, 2016 WL 2899267, at *7 n.2 (N.D. Ill. May 17, 2016); *see also Morris v. Colvin*, No. 14-CV-689, 2016 WL 3085427, at *8 n.7 (W.D.N.Y. June 2, 2016).

pain or other symptoms alleged." 20 C.F.R. §§ 404.1529(b), 416.929(b).

Second, after establishing that the claimant's conditions could be expected to produce the alleged symptoms, the ALJ must evaluate the intensity, persistence, and severity of the symptoms to determine the extent to which they prevent the claimant from performing basic work activities. *Id.* §§ 404.1529(a), 416.929(a). If the intensity, persistence, or severity of the symptoms cannot be established by objective medical evidence, the ALJ must consider "other evidence in the record in reaching a conclusion about the intensity, persistence, and limiting effects of an individual's symptoms," including a claimant's own statements. SSR 16-3p, 2016 WL 1119029, at *5-*6. In evaluating a claimant's statements regarding his or her symptoms, the ALJ will consider "all of the relevant evidence," including (1) the claimant's medical history, signs and laboratory findings, and statements from the claimant, treating sources, and non-treating sources, 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1); (2) objective medical evidence, which is obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, *id.* §§ 404.1529(c)(2), 416.929(c)(2); and (3) any other evidence relevant to the claimant's symptoms, such as evidence of the claimant's daily activities, specific descriptions of symptoms (location, duration, frequency and intensity), precipitating and aggravating factors, medication or medical treatment and resulting side effects received to alleviate symptoms, and any other factors relating to functional limitations and restrictions due to the claimant's symptoms. *Id.* §§ 404.1529(c)(3), 416.929(c)(3); *see also Craig*, 76 F.3d at 595; SSR 16-3p, 2016 WL 1119029, at *4-*7. In *Hines v. Barnhart*, the Fourth Circuit stated that:

> Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are

> inconsistent with the available evidence, including objective evidence of the
> underlying impairment, and the extent to which that impairment can
> reasonably be expected to cause the pain the claimant alleges he suffers.

453 F.3d at 565 n.3 (citing *Craig*, 76 F.3d at 595). The ALJ may not reject a claimant's allegations of intensity and persistence solely because the available objective medical evidence does not substantiate the allegations; however, the lack of objective medical evidence may be one factor considered by the ALJ. SSR 16-3p, 2016 WL 1119029, at *5.

SSR 16-3p provides further guidance on how to evaluate a claimant's statements regarding the intensity, persistence, and limiting effects of his or her symptoms. For example, the Ruling stresses that the consistency of a claimant's own statements should be considered in determining whether a claimant's reported symptoms affect his or her ability to perform work-related activities. *Id.* at *8. Likewise, the longitudinal medical record is a valuable indicator of the extent to which a claimant's reported symptoms will reduce his or her capacity to perform work-related activities. *Id.* A longitudinal medical record demonstrating the claimant's attempts to seek and follow treatment for symptoms may support a claimant's report of symptoms. *Id.* On the other hand, an ALJ "may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record," where "the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints," or "the individual fails to follow prescribed treatment that might improve symptoms." *Id.*

Ultimately, "it is not sufficient for [an ALJ] to make a single, conclusory statement that 'the individual's statements about his or her symptoms have been considered' or that 'the statements about the individual's symptoms are (or are not) supported or consistent.' It is also not enough for [an ALJ] simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for

the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the [ALJ] evaluated the individual's symptoms." *Id.* at *9. SSR 16-3p instructs that "[t]he focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person"; rather, the core of an ALJ's inquiry is "whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual's symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities." *Id.* at *10.

When considering whether an ALJ's evaluation of a claimant's reported symptoms is supported by substantial evidence, the Court does not replace its own assessment for those of the ALJ; rather, the Court scrutinizes the evidence to determine if it is sufficient to support the ALJ's conclusions. In reviewing the record for substantial evidence, the Court does not re-weigh conflicting evidence, reach independent determinations as to the weight to be afforded to a claimant's report of symptoms, or substitute its own judgment for that of the Commissioner. *Hays*, 907 F.2d at 1456. Moreover, because the ALJ had the "opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." *Shively v. Heckler*, 739 F.2d 987, 989 (4th Cir. 1984).

Here, Claimant criticizes the validity of the ALJ's symptoms evaluation for several reasons. First, she complains that the ALJ did not include all of her testimony in his summary; thereby, skewing the picture of how consistently Claimant is able to perform daily activities. (ECF No. 10 at 12-13). Second, Claimant contends that the ALJ improperly considered her lack of medical care as evidence that her symptoms were not severe, even

though she explained that she did not have medical coverage to pay for treatment until shortly before the administrative hearing. (*Id.* at 13). Next, Claimant argues that the ALJ impermissibly relied on the absence of objective proof of subjective symptoms to discredit Claimant's statements. She claims that the ALJ did not consider all of the factors he was required to consider in reaching his conclusion regarding the severity and persistence of her symptoms. (*Id.* at 14). Consequently, his symptoms assessment was insufficient and inadequately accounted for the limiting effects of her stomach pain, nausea, shortness of breath, and psychological impairments. The undersigned disagrees.

The ALJ began his analysis of the persistence, severity, and limiting effects of Claimant's symptoms by reviewing her testimony and the testimony of her mother. (Tr. at 21-22). The ALJ had already provided a thorough written summary of the objective medical evidence, and taking all of the evidence into consideration at the first step of the two-step process, concluded that Claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms. Nevertheless, the ALJ did not believe the symptoms were as functionally limiting as they were described to be by Claimant.

Moving to the second step of the process, the ALJ provided multiple reasons for his determination. In terms of Claimant's treatment, the ALJ remarked that Claimant had received medical care for her physical ailments for a period of at least six years before the alleged onset of disability. Yet, despite her ongoing pulmonary complaints, Claimant continued to smoke at least one-half pack of cigarettes per day. The ALJ also pointed out that Claimant continued to drink alcohol despite her diagnosis of alcohol dependence and abuse, (Tr. at 21-22), and left without being seen after going to the Emergency Department with symptoms of elevated blood pressure and a rash on her body, (Tr. at

25

22); additional signs that Claimant's symptoms were not as debilitating as portrayed. Clearly, these observations by the ALJ were valid grounds for discounting the alleged intensity and severity of Claimant's symptoms. *See* SSR 16-3p, 2016 WL 1119029, at *8 ("We will consider an individual's attempt to seek medical treatment for symptoms and to follow treatment once it is prescribed when evaluating whether symptom intensity and persistence affect the ability to perform work-related activities for an adult."). Along these lines, the ALJ observed that Claimant failed to follow-up on recommendations made by her treating physicians, which suggested "that the symptoms may not have been as serious as has been alleged." (*Id.*). *See* SSR 16-3p, 2016 WL 1119029, at *8 ("[I]f the [claimant] fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of [the claimant's] symptoms are inconsistent with the overall evidence of record.") The ALJ specifically mentioned Claimant's hepatitis C, which she had left untreated for at least two years. The record reflects that Claimant's provider at Prestera, Nurse Practitioner Munday, repeatedly advised Claimant to seek care for her hepatitis C from West Virginia Health Right, a free clinic. Accordingly, notwithstanding Claimant's lack of insurance, treatment sources were available to her. In addition, Ms. Munday counseled Claimant on the dangers of continuing to consume alcohol when carrying a diagnosis of hepatitis C. Yet, Claimant never sought care for that condition, nor entirely stopped drinking alcohol.

The ALJ further emphasized that even though Claimant went without treatment, her hepatitis C symptoms fortunately did not progress. She never showed signs of jaundice, hematemesis, or hematochezia. (Tr. at 22). Similarly, although Claimant complained of periodic abdominal pain, the ALJ took note that Claimant was never referred for specialized treatment, or underwent any surgical procedures. (*Id.*). Certainly,

an ALJ is permitted to consider the "frequency and extent of treatment" sought and received by a claimant to determine whether it is "comparable with the degree of the [claimant's] subjective complaints." SSR 16-3p, 2016 WL 1119029, at *8. The ALJ indicated that Claimant received minimal treatment; not the extent of treatment expected of someone suffering from total disability. The ALJ indicated that the treatment Claimant received was routine and conservative, and was generally successful in controlling Claimant's symptoms. (Tr. at 22). The ALJ commented that, moreover, Claimant did not allege any side effects from the medications that she took that would interfere with her ability to work. Claimant argues that the ALJ's analysis of the medical record was flawed, because he failed to allow for Claimant's lack of medical insurance. However, when that issue arose at the administrative hearing, the ALJ pointed out that Claimant had sought treatment at the Emergency Department for a variety of problems on at least five occasions in the prior year; yet, she did not pursue treatment for her stomach disorder, the very condition which she now claimed was the major obstacle impeding her ability to work. (Tr. at 56-57). The ALJ found the contradiction between Claimant's subjective complaints and her limited efforts to seek treatment, combined with the conservative type of treatment she received, to be probative evidence regarding the intensity of her symptoms.

The ALJ also reviewed Claimant's statements to determine their consistency with each other and with the objective findings. The ALJ highlighted some discrepancies that made him question the reliability of Claimant's statements. For instance, the ALJ indicated that in November 2012, Claimant went to Thomas Memorial Hospital and complained of difficulty breathing, but on examination, she had normal breath sounds and no evidence of respiratory distress. (Tr. at 22, 966). In addition, at the administrative

hearing, Claimant initially testified that she did nothing but sit around all day and watch television, sometimes not even getting out of bed for several days in a row, but then later in the hearing testified that she cooked complete "regular big meals" on a daily basis. (Tr. at 22, 49). With respect to Claimant's daily activities, the ALJ remarked that Claimant described activities that were not as limited as one would expect given her alleged symptoms. (Tr. at 23). The ALJ noted that Claimant had engaged in some work activity after the alleged onset date that, while not rising to the level of gainful activity, demonstrated abilities greater than portrayed by Claimant. The ALJ also took into account Claimant's role as the daily caretaker of her disabled grandson, recognizing the emotional and physical demands of such a position. (Tr. at 23). Indeed, Claimant described her grandson as having no motor skills, not being able to walk or talk, and requiring 24-hour care. (Tr. at 779).

Having reviewed the ALJ's symptom assessment, the undersigned **FINDS** that the ALJ complied with relevant Social Security rulings and regulations. He considered the severity, persistence, and limiting effects of Claimant's alleged symptoms using the two-step process. He confirmed the presence of medically determinable impairments that could be reasonably be expected to cause the type of symptoms complained of by Claimant. Then, as required, the ALJ evaluated Claimant's statements regarding the functional effects of her symptoms on her ability to perform work-related activities by examining the evidence. He considered objective medical findings, but did not limit his analysis to that evidence. The ALJ also assessed Claimant's and her mother's testimony, Claimant's daily activities, the side effects of her medications, the frequency and extent of treatment she received, and her compliance with treatment recommendations. The ALJ provided specific reasons for the weight given to Claimant's symptoms, and the reasons

were clearly articulated and supported by the evidence. Contrary to Claimant's contention, the ALJ was not required to discuss every piece of evidence. *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) (*citing Dyer v. Barnhart,* 395 F.3d 1206, 1211 (11th Cir.2005) ("there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision."). Nor was he required to explicitly address every factor listed in governing ruling. *See, e.g. Bramblett v. Colvin*, No. 2:14-CV-00011-RLV, 2016 WL 1249297, at *7 (W.D.N.C. Mar. 30, 2016). The ALJ provided a reasoned, thorough, and logical written evaluation of the limiting effects of Claimant's symptoms based upon the evidence of record. Accordingly, the undersigned **FINDS** that the ALJ's symptom evaluation is supported by substantial evidence.

## VIII.  <u>Recommendations for Disposition</u>

Based on the foregoing, the undersigned United States Magistrate Judge respectfully **PROPOSES** that the District Court confirm and accept the findings herein and **RECOMMENDS** that the District Court **DENY** Plaintiff's Motion for Judgment on the Pleadings, (ECF No. 10), **GRANT** Defendant's Motion for Judgment on the Pleadings, (ECF No. 11), and **DISMISS** this action, with prejudice, from the docket of the Court.

The parties are notified that this "Proposed Findings and Recommendations" is hereby **FILED**, and a copy will be submitted to the Honorable John T. Copenhaver, Jr., United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(d) and 72(b), Federal Rules of Civil Procedure, the parties shall have fourteen days (filing of objections) and three days (mailing) from the date of filing this "Proposed Findings and Recommendations" within which to file with the Clerk of this Court, specific written objections, identifying the portions of the "Proposed Findings and Recommendations" to which objection is made, and the basis of

such objection. Extension of this time period may be granted by the presiding District Judge for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. *Snyder v. Ridenour*, 889 F.2d 1363 (4th Cir. 1989); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984). Copies of such objections shall be provided to the opposing party, Judge Copenhaver, and Magistrate Judge Eifert.

The Clerk is directed to file this "Proposed Findings and Recommendations" and to provide a copy of the same to counsel of record.

**FILED:** June 21, 2016

Cheryl A. Eifert
United States Magistrate Judge